UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PATRICIA A. WILKINSON,           :
                                 :
          Plaintiff              :     CIVIL NO. 4:10-CV-2376
                                 :
     vs.                         :     (Judge Conaboy)
                                 :
MICHAEL J. ASTRUE,               :
COMMISSIONER OF SOCIAL           :
SECURITY,                        :
                                 :
          Defendant              :

MEMORANDUM

BACKGROUND

          The above-captioned action is one seeking review of a
decision of the Commissioner of Social Security ("Commissioner")
denying Plaintiff Patricia A. Wilkinson's claim for supplemental
security income benefits.

          Supplemental security income (SSI) is a federal income
supplement program funded by general tax revenues (not social
security taxes).  It is designed to help aged, blind or other
disabled individuals who have little or no income.

          Wilkinson was born in the United States on June 7, 1960.
Tr. 30, 89, 93, 97 and 116.[1]  Wilkinson graduated from high school
in 1978 and can read, write, speak and understand the English
language and perform basic mathematical functions. Tr. 31, 120 and
127.  During her elementary and secondary schooling Wilkinson
attended regular education classes. Tr. 127.  At the time of the

_____

1.  References to "Tr.___" are to pages of the administrative
record filed by the Defendant as part of his Answer on March 21,
2011.

administrative hearing held in this case on October 14, 2009,
Wilkinson did not have a driver's license because of a conviction
for driving under the influence of alcohol.[2] Tr. 31.

Records of the Social Security Administration reveal
that Wilkinson has a limited work and earnings history. Tr. 114.
Wilkinson had reported earnings in 1977 ($671.60), 1978
($1218.28), 1979 ($3226.30), 1980 ($3867.24), 1981 ($1242.46),
1983 ($1740.24), 1989 ($1141.47), 1990 ($2382.88), 1991
($3170.43), 1992 ($2747.53), 1993 ($569.81), 1999 ($923.63), 2000
($2799.07), 2001 ($3740.38), 2002 ($3293.39) and 2003 ($1179.00).
Id.  Wilkinson's total earnings were $33,913.71. Id.  Although
Wilkinson had positions as a cook, waitress and a pre-school
teaching assistant, a vocational expert testified that Wilkinson
had no past relevant employment.[3] Tr. 56, 122 and 133.

Wilkinson claims that she became disabled on March 31,
2003, because of "back pain, anxiety and depression[.]" Tr. 121. At
that time Wilkinson was working as a child care provider at a day
care facility. Tr. 33 and 1333.  She quit that job because she had

---

2.  As will be set forth in detail *infra*, Wilkinson has a
substantial history of abusing alcohol. The legal limit in
Pennsylvania is a blood alcohol level of .08 percent.  75
Pa.C.S.A. § 3731.

3.  Past relevant employment in the present case means work
performed by Wilkinson during the 15 years prior to the date her
claim for disability was adjudicated by the Commissioner.  20
C.F.R. §§ 416.960 and 416.965. In order to be considered past
relevant employment, an individual's earnings must reach a
certain level. Id.

to lift toddlers weighing up to 20 pounds. Tr. 137. Wilkinson has not worked since March 31, 2003.  Tr. 121.

At the administrative hearing when asked why she could not work, Wilkinson stated that she suffers from (1) severe back pain as the result of a surgical fusion of the spine, (2) emotional health issues involving depression and anxiety, and (3) the physical residuals of a motor vehicle accident which occurred in June, 2008.[4] Tr. 34.  With respect to the motor vehicle accident, Wilkinson claimed that she sustained a broken thigh bone (femur) and injury to her shoulder which increased her pain and impacted her ability to work. Tr. 34-36.

On December 7, 2007, Wilkinson protectively filed[5] an application for supplemental security income benefits. Tr. 12, 93, 97, 99 and 116.  The alleged disability onset date of March 31, 2003, has no impact on Wilkinson's application for supplemental security income benefits because supplemental security income is a needs based program and benefits may not be paid for "any period that precedes the first month following the date on which an application is filed or, if later, the first month following the date all conditions for eligibility are met."  See C.F.R. §

_____

4.  At the time of this accident, Wilkinson's blood alcohol level was .173 percent, twice the legal limit.

5.  Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

3

416.501.  Consequently, Wilkinson is not eligible for SSI benefits for any period prior to January 1, 2008.

On July 2, 2008, the Bureau of Disability Determination[6] denied Wilkinson's application for supplemental security income benefits. Tr. 67-68, 72-82 and 93.  On August 22, 2008, Wilkinson requested a hearing before an administrative law judge. Tr. 8, 83-85 and 95.  Approximately 14 months later, a hearing commenced on October 14, 2009, before an administrative law judge. Tr. 24-59.  On December 18, 2009, the administrative law judge issued a decision denying Wilkinson's application.[7] Tr. 12-22.  On January 27, 2010, Wilkinson requested that the Appeals Council review the administrative law judge's decision.  Tr. 6-7.  After about 9 months had passed, the Appeals Council on October 23, 2010, concluded that there was no basis upon which to grant Wilkinson's request for review. Tr. 1-5.  Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Wilkinson then filed a complaint in this court on November 17, 2010.  Supporting and opposing briefs were submitted

---

6.  The Bureau of Disability Determination is an agency of the Commonwealth of Pennsylvania which initially evaluates applications for supplemental security income benefits on behalf of the Social Security Administration.  Tr. 73.

7.  Wilkinson was 42 years of age on the alleged disability onset date and 49 years of age on the date of the administrative hearing and the date the ALJ issued her decision.  Wilkinson is presently 51 years of age.

and the appeal[8] became ripe for disposition on August 15, 2011, when Wilkinson elected not to file a reply brief.

For the reasons set forth below we will vacate the decision of the Commissioner and remand the case to him for further proceedings.

## STANDARD OF REVIEW

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v.

---

8.  Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the
Secretary must be accepted as conclusive by a reviewing court if
supported by substantial evidence."); Keefe v. Shalala, 71 F.3d
1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th
Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11
(11th Cir. 1990).

Substantial evidence "does not mean a large or
considerable amount of evidence, but 'rather such relevant evidence
as a reasonable mind might accept as adequate to support a
conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting
Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938));
Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d
Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).
Substantial evidence has been described as more than a mere
scintilla of evidence but less than a preponderance. Brown, 845
F.2d at 1213. In an adequately developed factual record
substantial evidence may be "something less than the weight of the
evidence, and the possibility of drawing two inconsistent
conclusions from the evidence does not prevent an administrative
agency's finding from being supported by substantial evidence."
Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all
the other evidence in the record," Cotter, 642 F.2d at 706, and
"must take into account whatever in the record fairly detracts from

its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488
(1971).  A single piece of evidence is not substantial evidence if
the Commissioner ignores countervailing evidence or fails to
resolve a conflict created by the evidence.  Mason, 994 F.2d at
1064.  The Commissioner must indicate which evidence was accepted,
which evidence was rejected, and the reasons for rejecting certain
evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707.
Therefore, a court reviewing the decision of the Commissioner must
scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968,
970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d
Cir. 1979).

     Another critical requirement is that the Commissioner
adequately develop the record. Shaw v. Chater, 221 F.3d 126, 131
(2d Cir. 2000)("The ALJ has an obligation to develop the record in
light of the non-adversarial nature of benefits proceedings,
regardless of whether the claimant is represented by counsel.");
Rutherford v. Barnhart, 399 F.3d 546, 557 (3d Cir. 2005); Fraction
v. Bowen, 787 F.2d 451, 454 (8th Cir. 1986); Reed v. Massanari,
270 F.3d 838, 841 (9th Cir. 2001); Smith v. Apfel, 231 F.3d 433.
437 (7th Cir. 2000);  see also Sims v. Apfel, 530 U.S. 103, 120
S.Ct. 2080, 2085 (2000)("It is the ALJ's duty to investigate the
facts and develop the arguments both for and against granting
benefits[.]").  If the record is not adequately developed, remand
for further proceedings is appropriate.  Id.

**SEQUENTIAL EVALUATION PROCESS**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating supplemental security income claims.  See 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[9] (2) has an impairment

---

9.  If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental
(continued...)

that is severe or a combination of impairments that is severe,[10] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[11] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the administrative law

---

9.  (...continued)
duties" and "is done (or intended) for pay or profit." 20 C.F.R. § 416.910.

10.   The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. § 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 416.923 and 416.945(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 416.945(b).  An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 416.945(c).

11.  If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

judge must determine the claimant's residual functional capacity. Id.[12]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. § 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**MEDICAL RECORDS**

Before we address the administrative law judge's decision and the arguments of counsel, we will review in detail Wilkinson's medical records.

Wilkinson at a young age developed scoliosis, an abnormal lateral curvature of the spine.[13] Tr. 181.  In 1981 when Wilkinson was about 22 years of age, she had surgery to correct the scoliosis. Id.  The surgery consisted of the insertion of

---

12.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

13.  Scoliosis is defined as "an appreciable lateral deviation in the normally straight vertical line of the spine." Dorland's Illustrated Medical Dictionary, 1681 (32nd  Ed. 2012).

instrumentation, a Harrington rod,[14] which fused the spine from the upper thoracic region to the L3 level of the lumbar region of the spine.[15] Tr. 181 and 265.

On March 28, 2003, Wilkinson had an x-ray of the lumbar and thoracic regions of the spine.[16] Tr. 265.  The x-rays

---

14.  A Harrington rod is defined as "a rigid contoured rod used in Harrington instrumentation."  Dorland's Illustrated Medical Dictionary, 1651 (32nd Ed. 2012).  Harrington instrumentation is defined as "a system of metal hooks and rods inserted surgically in the posterior elements of the spine to provide distraction and compression in treatment of scoliosis and other deformities." Dorland's Illustrated Medical Dictionary, 944 (32nd Ed. 2012). The Harrington rod, a stainless steal device developed by Dr. Paul Harrington in 1953, was utilized to treat scoliosis from the early 1960s to the late 1990s. Harrington Rod, Seton Spine & Scoliosis Center, http://www.setonspineandscoliosis.com/scoliosis /harrington.html (Last accessed May 2, 2012): Keith Bridwell, M.D., Idiopathic Scoliosis: Options of Fixation and Fusion of Thoracic Curves, http://www.spineuniverse.com/conditions/ scoliosis/idiopathic-scoliosis-options-fixation-fusion (Last accessed May 2, 2012); Instrumentation Systems for Scoliosis Surgery, National Scoliosis Foundation, http://www.scoliosis.org /resources/medicalupdates/instrumentationsystems.php (Last accessed May 2, 2012).

15.  Scoliosis can be congenital, the result of a developmental abnormality, or idiopathic, that is of unknown cause. The most common type of scoliosis is idiopathic adolescent scoliosis. Jonathan Cluett, M.D., Scoliosis, About.com Orthopedics, http://orthopedics.about.com/cs/scoliosis/a/ scoliosis.htm (Last accessed April 26, 2012);Scoliosis, OrthoInfo, American Academy of Orthopaedic Surgeons, http:// orthoinfo.aaos.org/topic.cfm?topic=A00236 (Last accessed April 26, 2012). One medical record suggests that Wilkinson's scoliosis was idiopathic. Tr. 214.

16.  In order to understand the issues in this case, it is necessary to outline the anatomy of the spine. The spine (vertebral column) from the head to the tailbone is divided into five regions: the cervical (consisting of 7 vertebrae, C1-C7 in descending order), the thoracic (12 vertebrae, T1-T12 in descending order), the lumbar (5 vertebrae, L1-L5 in descending order), the sacrum (5 fused vertebrae, S1-S5 in descending order)

(continued...)

_____

16.   (...continued)
and the coccyx (4 fused vertebrae). Other than the first two
vertebrae of the cervical spine (C1 and C2), the vertebrae of the
cervical, thoracic and lumbar regions are similarly shaped.

A vertebra consists of several elements, including  the
vertebral body (which is the anterior portion of the vertebra),
pedicles, laminae and the transverse processes.  The vertebral
body is the largest part of the vertebra and is somewhat oval
shaped. The pedicles are two short processes made of bone that
protrude from the back of the vertebral body.  The laminae are
two broad plates extending dorsally and medially from the
pedicles and fusing to complete the vertebral arch (which is the
posterior portion of the vertebra) and encloses the spinal cord.
On an axial view of the vertebra, the transverse processes are
two somewhat wing-like structures that extend on both sides of
the vertebral body from the point where the laminae join the
pedicles. The transverse processes serve for the attachment of
ligaments and muscles. The endplates are the top and bottom
portions of a vertebral body that come in direct contact with the
intervertebral discs.

The intervertebral discs (made of cartilage) are the
cushions (shock absorbers) between the bony vertebral bodies that
make up the spinal column. Each disc is made of a tough outer
layer and an inner core composed of a gelatin-like substance. The
outer layer of an intervertebral disc is called the annulus
fibrosus. Jill PG Urban and Sally Roberts, Degeneration of the
intervertebral disc, PublicMedCentral,http://www.ncbi.nlm.nih.
gov/pmc/articles/PMC165040/(Last accessed April 26, 2012); see
also Herniated Intervertebral Disc Disease, Columbia University
Medical Center, Department of Neurology, http://www.columbianeuro
surgery.org/conditions/herniated-intervertebral-disc-disease/
(Last accessed April 26, 2012).

"The facet joints [also known as the zygapophyseal joints]
connect the posterior elements of the [vertebrae] to one another.
Like the bones that form other joints in the human body, such as
the hip, knee or elbow, the articular surfaces of the facet
joints are covered by a layer of smooth cartilage, surrounded by
a strong capsule of ligaments, and lubricated by synovial fluid.
Just like the hip and the knee, the facet joints can also become
arthritic and painful, and they can be a source of back pain.
The pain and discomfort that is caused by degeneration and
arthritis of this part of the spine is called facet arthropathy,
which simply means a disease or abnormality of the facet joints."
Facet Arthropathy, Back.com, http://www.back.com/causes-
mechanical-facet.html (Last accessed April 26, 2012). The facet
joints are in the back of the spine and act like hinges, There
are two superior (top) and two inferior (bottom) portions to each
(continued...)

revealed the fusion with the Harrington rod from the upper thoracic spine down to the L3 level of the lumbar spine. Tr. 183. It was noted that there was still scoliosis but that the area under the rod was fused. Tr. 182.  On flexion and extension there were abnormal movements noted below the fusion level at L3-L4. Id. There was also a grade 1 spondylolisthesis[17] of L5 over S1 and a "[v]ery minimal perhaps a few millimeter spondylolisthesis of L4 over L5[.]" Tr. 265.  The x-rays revealed osteopenia[18] and marginal sclerosis[19] of the facet joints. Id.

---

16.  (...continued)
facet joint called the superior and inferior articular processes.

17.  "The word spondylolisthesis derives from two parts - spondylo which means spine, and listhesis which means slippage. So, a spondylolisthesis is a forward slip of one vertebra (i.e., one of the 33 bones of the spinal column) relative to another. Spondylolisthesis usually occurs towards the base of your spine in the lumbar area. . . Spondylolisthesis can be described according to its degree of severity. One commonly used description grades spondylolisthesis, with grade 1 being least advanced, and grade 5 being most advanced. The spondylolisthesis is graded by measuring how much of a vertebral body has slipped forward over the body beneath it." Spineuniverse.com, Spondylolisthesis: Back Condition and Treatment, http://www. spineuniverse.com/conditions/spondylolisthesis/spondylolisthesis-back-condition-treatment (Last accessed April 26, 2012). Grad 1 spondylolithesis is where up to 25% of the vertebral body has slipped forward over the vertebral body beneath it. Id. Symptoms of this condition include pain in the lower back, pain and weakness in one or both legs, and an altered gait. Id.  Some people who have this condition exhibit no symptoms. Id.

18.  Osteopenia is defined as "any decrease in bone mass below the normal." Dorland's Illustrated Medical Dictionary, 1347 (32nd Ed. 2012).

19.  Sclerosis is defined as "an induration or hardening, such as
(continued...)

On April 8, 2003, Wilkinson had an appointment with Rein Anton, M.D., Ph.D., a neurosurgeon at the Guthrie Clinic, Sayre, Pennsylvania. Tr. 181-183.  At that appointment Wilkinson complained of low back pain which radiated "into the left leg and sometimes all the way down to the foot." Id.  The results of a physical examination were essentially normal. Tr. 182. Notably, Wilkinson had full range of motion in all four extremities; she had no joint swelling or tenderness; she was oriented to person, place and time and had insight into her existing medical problems; she was neurologically intact; she had normal sensation to pinprick, touch, vibration and temperature in the upper and lower extremities; she had normal motor strength in the upper and lower extremities; she had a normal gait and coordination and was able to walk on heels and toes and hop on either leg; she had normal deep tendon reflexes; and her speech was fluent. Tr. 182.

Dr. Anton reviewed the x-rays and concluded that the grade 1 spondylolisthesis at the L5-S1 level was stable. Tr. 183. Dr. Anton further stated that Wilkinson had no abnormal neurological findings. Id.  He did state, however, that Wilkinson "has a very abnormal spine which still has scoliosis, arthritis, and abnormal movements below the fusion level, as well as spondylolisthesis. This is a very complicated situation. The

---

19.  (...continued)
hardening of a part from inflammation, increased formation of connective tissue, or disease of the interstitial substance." Dorland's Illustrated Medical Dictionary, 1680 (32nd Ed. 2012).

decision needs to be made if the rod can be removed and if the spines need to be fused, connecting the past fusion to the nonfused lumbar spine down to the sacrum." Id.  Dr. Anton advised Wilkinson to consult with the surgeon who performed the original surgery[20] and that because she had no neurological symptoms at the moment it was not an urgent matter but that if the pain persisted surgery was possibly an option. Id.  Dr. Anton did not schedule a follow-up appointment but noted that he would see Wilkinson on an as needed basis. Id.

On January 22, 2004, Wilkinson had an initial appointment with Edward L. Jones, M.D.,[21] a family practitioner, at Guthrie Clinic, Athens, Pennsylvania. Tr. 255-256.  The appointment was primarily for a gynecological examination and to schedule a mammogram. Id.  At the appointment Wilkinson told the medical provider that she "occasionally continues to have back pain" and Wilkinson "request[ed] recommendations regarding medication." Id. It was noted that Wilkinson smoked a pack of cigarettes per day. Id.  The results of a physical examination were essentially normal other than cystic breasts and a urinalysis revealed the presence of pus in the urine, pyuria. Tr. 256.  The medical provider advised

_____

20.  There is no indication in the record that Wilkinson consulted with the surgeon who performed the original surgery.

21.  The record is not clear as to whether Wilkinson had an appointment with Dr. Jones or only Kim Trahan, a certified physician assistant.

15

Wilkinson to quit smoking, referred her for a mammogram, and ordered blood work and a urine culture. Id.

We were unable to discern the results of the urine culture in the administrative record.  A mammogram was performed on February 4, 2004, the results of which were not of a serious nature. Tr. 263.  The interpreting physician merely recommended a "six-month sonographic follow-up of complex nodule, upper outer quadrant of the left breast." Id.  On April 16, 2004, it appears that Wilkinson had a consultation with Physician Assistant Trahan (referred to in footnote 21) regarding complaints of depression and questions regarding menopause and menometrorrhagia (excessive, irregular uterine bleeding).  On May 7, 2004, Wilkinson had a colonoscopy which revealed non-bleeding internal hemorrhoids and she was advised to consume a high fiber diet and have a follow-up colonoscopy in 10 years. Tr. 268.  On October 22, 2004, Wilkinson had a follow-up left breast ultrasound which was benign in nature. Tr. 262.  On February 15, 2005, Wilkinson had an appointment with Dr. Jones's physician assistant regarding a respiratory infection. Tr. 252.  The records of these appointments give no indication of Wilkinson's physical functional abilities, such as gait, muscle strength or range of motion of her extremities or spine.

Wilkinson's next medical appointment was with Dr. Jones on August 29, 2005. Tr. 250-251.  At that appointment Wilkinson complained of "pain in her back, going into her left buttock, left

16

hip, and down her left leg, which [was] becoming increasingly severe over the past three or four days." Tr. 250.  A physical examination of Wilkinson revealed that she was in moderate distress, "very slow to move and change position," and she had tenderness over the sciatic notch; a straight leg raise test was positive on the left at 50 degrees and according to Dr. Jones positive on the right at 80 degrees;[22] and the iliopsoas sign was negative bilaterally.[23] Id.  Wilkinson had fair to good motor strength in the right lower extremity but weakness in "her foot/ankle region on the left." Id.  Dr. Jones's assessment was that Wilkinson suffered from "[s]ciatica[24] with weakness going into

---

22.  The straight leg raise test is done to determine whether a patient with low back pain has an underlying herniated disc.  The patient, either lying or sitting with the knee straight, has his or her leg lifted.  The test is positive if pain is produced between 30 and 70 degrees. Niccola V. Hawkinson, DNP, RN, Testing for Herniated Discs: Straight Leg Raise, SpineUniverse, http://www.spineuniverse.com/experts/testing-herniated -discs-straight-leg-raise (Last accessed April 26, 2012).

23.  "The iliopsoas muscle [is] one of the largest and most powerful hip flexors . . . It is a major muscle responsible for movement of the leg and trunk . . . Low back pain is often misdiagnosed as it relates to the joints of the lumbar spine. Attention may be given to these joints when the source of diffuse achy pain may actually be the iliopsoas muscle. . . The iliopsoas muscle inserts onto the vertebrae of the lumbar spine, and when it is hypertonic or in spasm, it may cause significant dysfunction in the spine and put added pressure on the discs." Blake Biddulph, D.C., Iliopsoas Muscle Injury Symptoms, Livestrong.com, http://www.livestrong.com/article/88551-iliopsoas -muscle-injury-symptoms/ (Last accessed May 2, 2012).

24.  Lumbar radiculopathy or sciatica is defined as "a syndrome characterized by pain radiating from the back into the buttocks and along the posterior or lateral aspect of the lower limb; it is most often caused by protrusion of a low lumbar intervertebral
(continued...)

17

the left leg." Id.  Dr. Jones prescribed the medications Lortab,[25] Ibuprofen[26] and Flexeril,[27] referred Wilkinson to physical therapy and advised her to apply "[h]eat locally to her sciatic notch." Id. Dr. Jones stated that if Wilkinson could not tolerate physical therapy that he would have to "reassess" her condition and that she would "need some neurosurgical care." Tr. 251.

On August 30, 2005, Wilkinson had a CT scan of the lumbar spine which revealed "[o]steoporosis,[28] postoperative changes and a Harrington rod posteriorly associated with fused bone graft material extending from the thoracic region inferiorly down to the level of L4. No osseous fracture or vertebral body

---

24.  (...continued)
disk. The term is also used to refer to pain anywhere along the course of the sciatic nerve." Dorland's Illustrated Medical Dictionary, 1678 (32nd  Ed. 2012); see also Center for Pain Management, Lumbar Radiculopathy/Sciatica, http://www.indypain. com/chronic-pain-acute-pain-conditions/lumbar-radiculopathy-sciat ica/ (Last accessed May 3, 2012).

25.  "Lortab contains a combination of acetaminophen and hydrocodone. Hydrocodone is in a group of drugs called opioid pain relievers. An opioid is sometimes called a narcotic. Acetaminophen is a less potent pain reliever that increases the effects of the hydrocodone." Lortab, Drugs.com, http://www.drugs.com/lortab.html (Last accessed May 2, 2012). Other brand names for this drug are  Norco and Vicodin. Id.

26.  Ibuprofen (Motrin) is a nonsteroidal anti-inflammatory drug. Ibuprofen, Drugs.com, http://www.drugs.com/ibuprofen.html (Last accessed May 2, 2012).

27.  "Flexeril (cyclobenzaprine) is a muscle relaxant." Flexeril, Drugs.com, http://www.drugs.com/flexeril.html (Last accessed May 2, 2012)

28.  Osteoporosis is defined as "reduction in bone mineral density, leading to fractures after minimal trauma." Dorland's Illustrated Medical Dictionary, 1348 (32nd  Ed. 2012).

compression deformity [was] identified.  No spinal canal stenosis[29] [was] appreciated." Tr. 261.

On September 19, 2005, Wilkinson had x-rays of the lumbar spine which revealed the fusion, the Harrington rod, a moderate levoscoliosis,[30] "5 mm. of spondylolisthesis of L4 on L5 which does not change from flexion to extension," and severe osteoarthritic changes of the facet joints at L4-L5 and L5-S1 below the fusion. Tr. 267. The x-rays were interpreted by Leon Feldhamer, M.D., and his impression was that the spondylolisthesis at L4-5 was stable. Id.

On September 23, 2005, Wilkinson had an appointment with Dr. Anton at which Wilkinson complained of "low back pain radiating in to the left leg, sometimes all the way to the left foot" and "numbness in the same area that comes and goes." Tr. 184-185.  Dr. Anton noted that Wilkinson reported that the pain had "improved substantially lately" and that Wilkinson was seen in 2003 after which "the pain subsided, but now the pain came back." Id.  When

29.  "Spinal stenosis is a narrowing of one or more areas in your spine – most often in your neck or lower back. This narrowing can put pressure on the spinal cord or spinal nerves at the level of compression. Depending on which nerves are affected, spinal stenosis can cause pain or numbness in your legs, back, neck, shoulders or arms; limb weakness and incoordination; loss of sensation in your extremities; and problems with bladder or bowel function. Pain is not always present, particularly if you have spinal stenosis in your neck." Spinal Stenosis, Definition, Mayo Clinic staff, Mayoclinic.com, http://www.mayoclinic.com/health /spinal-stenosis/DS00515 (Last accessed May 2, 2012).

30.  Levoscoliosis is a type of scoliosis where the curvature of the spine is to the left. Levoscoliosis, http://levoscoliosis. net/ (Last accessed May 2, 2012).

Dr. Anton conducted a review of Wilkinson's systems[31] Wilkinson reported that she tires easily; she has night sweats; she is sensitive to heat; she is irritable and has poor sleep; she has abdominal distress and hemorrhoids; and she has headaches, dizziness, weakness of the muscles, and pain in the legs. Tr. 184. The results of a physical examination were essentially normal other than "bilateral facial weakness related to [Wilkinson's] Moebius syndrome,"[32] some questionable numbness and tingling in the extremities, and the inability to "hop because of low back pain." Tr. 184-185.  Dr. Anton noted that Wilkinson "walked in [his] office." Tr. 185.

Dr. Anton reviewed the radiographs and stated that Wilkinson had grade 1 spondylolisthesis at the L4-L5 level with major lumbar stenosis at that level, abnormal discs at the L3-L4 and the L5-S1 levels, and minimal spondylolisthesis and no major stenosis at the L5-S1 level. Tr. 185.  He further stated after reviewing the recent CAT scan that above the L3 level of the lumbar

---

31.  "The review of systems (or symptoms) is a list of questions, arranged by organ system, designed to uncover dysfunction and disease." A Practical Guide to Clinical Medicine, University of California, School of Medicine, San Diego, http://meded.ucsd.edu/clinicalmed/ros.htm (Last accessed April 27, 2012).

32.  "Moebius syndrome is a rare birth defect caused by the absence or underdevelopment of the 6th and 7th cranial nerves, which control eye movements and facial expression." Moebius Snydrome Information Page, National Institue of Neurological Disorders and Stroke, National Institutes of Health, http://www.ninds.nih.gov/disorders/mobius/moebius.htm (Last accessed May 2, 2012).  An alternate spelling for this condition is Mobius.

spine, the spine was fused with the Harrington rod and that "it is obvious that the rod is deeply incased in the fusion[.]" Id.  He again noted that there was lumbar stenosis at the L4-L5 level and to a much lesser extent at the L3-L4 and L5-S1 levels. Id.

Dr. Anton in the impression section of the report of the September 23rd appointment reiterated the findings of grade 1 spondylolisthesis and major lumbar stenosis at the L4-L5 level. Id. Dr. Anton recommended that Wilkinson "try one more time with conservative treatment" and referred her to a pain clinic for epidural and cortisone injections at the L4-L5 level as well as injections at the L5-S1 and L3-L4 levels of the spine. Id.  Dr. Anton stated that "[i]f all these treatments fail, then lumbar fusion is an option. In that case, previous fusion needs to be hooked up to new [fusion]," Id.   Dr. Anton noted that at this time Wilkinson is not interested in surgery and that she would like to try nonsurgical treatment. Id.  Dr. Anton referred Wilkinson to the pain clinic and noted that he would follow Wilkinson on an as needed basis.[33] Id.

---

33.  The administrative law judge in this case basically dismissed as unremarkable the record of the September 23, 2005, appointment with Dr. Anton by stating that it "is a relatively normal neurological examination and the doctor is thus recommending a fairly normal course of action for the claimant's pain." Tr. 17. The administrative law judge does not comment on the finding of grade 1 spondylolithesis and major lumbar stenosis or the finding of severe osteoarthritic changes of the facet joints at L4-5 and L5-S1 below the fusion as a potential source of Wilkinson's pain.  Also, the portion quoted by the ALJ related to Dr. Anton's interpretation of the radiographs (not Dr. Anton's neurological examination of Wilkinson) and it is clear that the
(continued...)

After Wilkinson's  September 23, 2005, appointment with Dr. Anton we do not discern in the administrative record any medical records of Wilkinson being treated until April 23, 2006. On that date in the early morning hours, Wilkinson was transported by ambulance to the emergency department at Robert Packer Hospital, Sayre, Pennsylvania because of a possible drug overdose. Tr. 230-231.  Allegedly, Wilkinson's husband walked in on her when she was consuming a "handful of Effexor tablets."[34] Tr. 230.  Wilkinson also allegedly had consumed a quantity of alcohol around midnight. Id.  The emergency room physician, Raman Sucharita, M.D., placed Wilkinson on a heart monitor and ordered a battery of blood tests, including blood alcohol testing which revealed a blood alcohol level of .182 percent. Tr. 231. Repeat blood alcohol testing was scheduled for 9:00 a.m. Id.   However, at about 6:00 a.m. Wilkinson's husband signed her out against medical advice and took her home stating that he would "bring her back [] if he found that

---

33.   (...continued)
radiographs did not reveal a normal spine.  Furthermore, the statement by the ALJ that Dr. Anton "recommended a fairly normal course of action for the claimant's pain" is troubling because the ALJ fails to mention that Dr. Anton indicated that if the conservative treatment failed that Wilkinson would most likely need further surgery.

34.  "Effexor (venlafaxine) is an antidepressant . . . used to treat major depressive disorder, anxiety, and panic disorder." Effexor, Drugs.com, http://www.drugs.com/effexor.html (Last accessed May 3, 2012).

she had any further problems or if she indicated any suicidal
ideations."[35]   Id.

Later that day, Wilkinson after sobering up returned to
the emergency department apparently concerned about her mental
health and her suicide attempt and requested a psychiatric
evaluation. Tr. 232.  Wilkinson told James Raftis, D.O., the
emergency room physician, that she felt very anxious; she is always
on edge; she suffers from depression and is sleeping all the time;
and she was having poor concentration. Id.  She further told Dr.
Raftis "that in the last six months she began drinking vodka and
now drinks up to a half bottle of vodka daily" which she stated was
a "new problem for her." Id.  She also stated that she had no
homicidal ideations but was concerned about some "aggressive"
statements she made to her family and "it scared her." Id.
Wilkinson denied "any other recent illnesses." Id.

A physical examination by Dr. Raftis was essentially
normal. Id.  Dr. Raftis noted that Wilkinson appeared in no
distress and a neurological examination was grossly intact. Id.  A
repeat blood alcohol test was ordered. Id.  No alcohol was
detected. Id.  Dr. Raftis's impression was that Wilkinson was
suffering from an "[a]nxiety disorder with major depression and
suicidal ideation" and alcohol abuse. Id.  There is a notation in
this record that Dr. Raftis intended to consult the hospital's

---

35.  A subsequent medical record indicates that Wilkinson "signed
out with her husband's agreement against medical advice." Tr.
232.

"Crisis Service for evaluation of [Wilkinson] for voluntary psychiatric admission for further inpatient treatment." Id.

Subsequently, Wilkinson was voluntarily admitted to the Behavioral Science Unit of the Robert Packer Hospital because the next record we encounter is a discharge summary from that unit dated April 27, 2006. Tr. 229-230. The discharge summary was prepared by Charles McGurk, M.D., a psychiatrist. Id. That document states in pertinent part as follows:

> MENTAL STATUS EXAM: On admission, . . . She said that she sometimes heard whispers when she woke up in the morning, possibly associated with sleep deprivation or drinking the previous night. No other signs of psychosis were present. Suicidal ideation had been present and in view of her suicidal behavior risk was considered to be high if not in the hospital. No homicidal ideation was elicited. Sensorium was grossly intact. Insight and judgment was poor.

> MEDICAL EVALUATION: Review of systems was positive for pain in her back and legs. Medical history included a congenital syndrome affecting her face called the Mobius syndrome. She also has a history of anemia and continuing back pain . . . .

> SUMMARY OF HOSPITAL COURSE: The patient was admitted to the Behavioral Science Unit on a voluntary status. She participated actively in the treatment program including individual and group psychotherapy . . . . The patient had talked freely with staff and in therapy groups about her problems. Her suicidal ideation had abated and she was felt to be safe for discharge, i.e., risks of suicidal behaviors were minimal on 4/27/2006. Thus she was discharged to home. . . .

> REFERRAL: The patient was referred to Northern Tier Counseling for psychotherapy. . . .

Tr. 229-230. Her condition at discharge was noted to be "partially improved" and her medications at discharge were Effexor, Risperdal,

Klonopin and Trazodone[36]. Tr. 230.  The discharge summary also reveals that Wilkinson had a prior stay in the Behavioral Science Unit at the Robert Packer Hospital in June, 2005. Tr. 229. However, the administrative record does not contain those records.

On May 10, 2006, Wilkinson was evaluated by Suresh Undavia, M.D., a psychiatrist, located in Vestal, New York. Tr. 187-191. A mental status examination was essentially normal except for Wilkinson's report that she was hearing voices. Tr. 189. Dr. Undavia's assessment was that Wilkinson suffered from major depressive disorder, recurrent with some psychotic features and a "[m]ood disorder secondary to chronic medical condition - chronic pain." Tr. 190.  Dr. Undavia gave Wilkinson a Global Assessment of Functioning (GAF) score of 50 to 55.[37] Id.

_____

36.  Risperdal is an antipsychotic medication used to treat schizophrenia and symptoms of bipolar disorder. Risperdal, Drugs.com, http://www.drugs.com/risperdal.html (Last accessed May 2, 2012). Klonopin (clonazepam) is a benzodiazepine drug used to treat seizure disorders or panic disorder. Klonopin, Drugs.com, http://www.drugs.com/klonopin.html (Lasr accessed May 2, 2012). Trazodone is an antidepressant medication. Trazodone, Drugs.com, http://www.drugs.com/trazodone.html (Last accessed May 2, 2012).

37.  The Diagnostic and Statistical Manual of Mental Disorders uses a multiaxial approach in diagnosing mental disorders. The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness.  *Diagnostic and Statistical Manual of Mental Disorders* 3-32 (4th ed. 1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. Id. The score is useful in planning treatment and predicting outcomes. Id.  A GAF score of 21-30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas.  A GAF score of 31-40 represents
(continued...)

On August 26, 2006, Wilkinson was admitted to the
psychiatric unit of a hospital in Binghamton, New York, under the
care of Dr. Undavia. Tr. 208-213.  At admission on August 26th
Wilkinson was given a GAF score of 35. Tr. 210. The records of this
hospitalization reveal that Wilkinson had been abusing alcohol and
was depressed over having had an affair. Tr. 211. After examining
Wilkinson subsequent to her admission Dr. Undavia gave Wilkinson a
GAF score of 40. Tr. 212.  It was his opinion that Wilkinson
suffered from a mood disorder with psychotic features. Id.  Dr.
Undavia's initial diagnosis was bipolar disorder II with a history
of psychotic features and alcohol abuse, episodic. Id.  He further
noted that she had a "[h]istory of mood disorder secondary to
chronic medical condition - Mobius syndrome." Id.  During her stay
at the hospital, Wilkinson received psychotherapy and
electroconvulsive therapy (ECT).

Wilkinson was discharged from the hospital on September
1, 2006. Tr. 208-210.  At discharge, she was diagnosed as suffering
from major depressive disorder, recurrent with some psychotic

_____

37.  (...continued)
some impairment in reality testing or communication or major
impairment in several areas, such as work or school, family
relations, judgment, thinking or mood. Id.  A GAF score of 41-50
indicates serious symptoms or any serious impairment in social,
occupational or school functioning. Id.  A GAF score of 51 to 60
represents moderate symptoms or any moderate difficulty in
social, occupational, or school functioning. Id. A GAF score of
61 to 70 represents some mild symptoms or some difficulty in
social, occupational, or school functioning, but generally
functioning pretty well with some meaningful interpersonal
relationships. Id.

features, a mood disorder secondary to chronic alcohol abuse, and an unresolved grief reaction apparently related to her marital affair. Id.  Dr. Undavia gave her a discharge GAF score of 45. Id. Wilkinson's medications at discharge were Valium[38] and Trazodone. Id.  It was further noted that Wilkinson would be receiving outpatient ECT and would be receiving care from Dr. Undavia "once the ECT course has finished." Tr. 209.

During Wilkinson's stay in the psychiatric unit from August 26 to September 1, 2006, radiographs (x-rays) of her cervical, thoracic and lumbar spine were taken. Tr. 220-223.

The x-ray of the cervical spine revealed "[m]oderate arthritic disease, C5-6 and mild arthritic disease, C6-7." Tr. 222. The alignment of the vertebrae were "within normal limits." Id. The x-ray revealed moderate joint space narrowing at the C5-6 level, moderate spur formation at the C5-6 level, and mild spur formation at the C6-7 level. Id.

The x-ray of the thoracic spine revealed "[m]oderate scoliosis . . . with Harrington rod in place." Tr. 220. Tr. 229.

The x-ray of the lumbar spine also revealed "moderate scoliosis . . . with Harrington rod in place." Tr. 221. The lumbar

---

38.  "Valium (diazepam) belongs to a group of drugs called benzodiazepines. Diazepam affects chemicals in the brain that may become unbalanced and cause anxiety.  Valium is used to treat anxiety disorders, alcohol withdrawal symptoms, or muscle spasms." Valium, Drugs.com, http://www.drugs.com/valium.html (Last accessed May 3, 2012).

spine x-ray did reveal degenerative changes "at the L5-S1 level as indicated by sclerosis within the apophyseal joints"[39] and "7 mm of anterior subluxation[40] of L4 on L5 with respect to S1."[41] Id.

On October 4, 2006, Wilkinson was brought by her family to the emergency department of the Robert Packer Hospital, Sayre, after she cut her leg. Tr. 227.  The laceration was "from her groin down her thigh, around her knee and down her lower leg to her ankle." Tr. 226. The laceration was primarily superficial other than at the shin where it was about 3 inches. Tr. 228. Wilkinson's blood alcohol level was .258%. Tr. 226.  Wilkinson was treated in the emergency department and then involuntarily committed to the Behavioral Science Unit of Robert Packer Hospital where she stayed until her discharge from the hospital on October 10, 2006. Tr. 224-225.

At the time of admission to the Behavioral Science Unit,[42] Dr. McGurk's assessment was that Wilkinson suffered from major depression, recurrent, severe with psychotic features; alcohol dependence; and panic disorder by history. Tr. 227.  Dr.

---

39.  The apophyseal joints are the facet joints described in footnote 16.

40.  Subluxation is defined as "an incomplete or partial dislocation." Dorland's Illustrated Medical Dictionary, 1791 (32nd  Ed. 2012).

41.  This is describing the spondylolithesis mentioned in footnote 17.

42.  Wilkinson had two previous admissions to the Behavioral Science Unit, the first in June, 2005 and the second in April, 2006. Tr. 224.

McGurk gave her a GAF score of 25.  Id.  During her stay in the
Behavioral Science Unit, Wilkinson received individual and group
psychotherapy and was prescribed Effexor and the sleep aid
Ambien.[43]  Id.  "She was also given Klonopin because she was very
anxious during the course of her stay . . . [and] given thiamine,
daily vitamins and folic acid because she had been drinking." Tr.
225.  As therapy proceeded she denied any further suicidal
ideations and stated that she would cease drinking. Id.
Consequently, it was determined that she was no longer a danger to
herself and was discharged on October 10, 2006. Id.  At discharge
her diagnosis was major depression, recurrent, severe with
psychotic features; panic disorder; and alcohol dependence. Tr.
224. She was given a GAF score of 50. Id.

On November 6, 2006, Wilkinson appears to have had an
appointment regarding her depression and anxiety disorder with
either Dr. Jones or Physician Assistant Trahan at the Guthrie
Clinic in Athens, Pennsylvania. Tr. 248-249.  The appointment
lasted 40 minutes and Wilkinson was advised that Dr. Jones would
not take over her psychiatric care but that she should continue
with her psychiatrist. Id.  Wilkinson was continued on the Effexor,
her prescription for Klonopin (clonazepam) was increased, and she
was strongly encouraged not to drink and asked to contact
Alcoholics Anonymous. Id.  A follow-up appointment was scheduled in

---

43.   Ambien, Drugs.com, http://www.drugs.com/ambien.html (Last
accessed May 2, 2012).

three months, and if at that time her insurance had lapsed because of her divorce, the clinic would attempt to "get her to Northern Tier Counseling" for psychiatric care. Id.

On December 18, 2006, Wilkinson was taken by her husband and daughter to the emergency department at Robert Packer Hospital because she consumed a large amount of vodka and became suicidal. Tr. 236. The report of this emergency department visit states in pertinent part as follows: "She has been drinking large amounts of vodka over the past several weeks. She admits to drinking around 24 ounces of vodka a day. Her husband indicates that she is also drinking Benadryl elixir and NyQuil, although the patient denied this. Does admit to using marijuana approximately a month ago, but states that she usually does not abuse recreational drugs. Tonight, she became extremely combative . . . she became suicidal. She got a knife . . . and was threatening to kill herself and had to be physically restrained and disarmed. . . Apparently did not actually harm herself tonight . . . ." Id.  While in the emergency department, several diagnostic tests were ordered, including a blood alcohol test which reveal a blood alcohol level of .270%. Id. Wilkinson was admitted to the hospital for overnight observation. Tr. 246. She was discharged the next day "with an outpatient followup appointment for counseling and a recommendation to start Antabuse[.]"[44] Id.

---

44. "Antabuse (disulfiram) interferes with the metabolism of alcohol resulting in unpleasant effects when alcohol is consumed.
(continued...)

Wilkinson subsequently started on Antabuse and had appointments with either Dr. Jones or Physician Assistant Trahan on December 20 and 22, 2006 and January 4 and February 19, 2007. Tr. 242-247. At the appointment on January 4, 2007, Wilkinson reported that she was "doing pretty well[.]" Tr. 244.  A physical examination was essentially normal and she had been abstinent since starting on the Antabuse. Id.  It was noted that "[s]he [would] continue with her excellent lifestyle modifications." Id.  At the appointment on February 19, 2007, it was reported that Wilkinson had been sober for 60 days and that she was seeing a therapist who was "helping her dramatically." Tr. 242.  She did complain of "back pain, left leg pain, and occasional left foot numbness[.]" Id.  It was further noted that she had been treated with steroid "injections without significant improvement" and that nerve blocks had been recommended but that she had "not had those as yet." Id.  The assessment was "alcohol abuse, chronic back pain and depression/anxiety." Id.

On April 27, 2007, Wilkinson had an appointment with Aileen Colunio, a certified family nurse practitioner, at the Anesthesia/Pain Clinic, Guthrie Clinic, located in Sayre. Tr. 379-380.  The record of this appointment indicates it was a follow-up appointment and that Wilkinson had been last seen in October, 2005,

---

44.  (...continued)
Antabuse is used to treat chronic alcoholism." Antabuse, Drugs.com, http://www.drugs.com/antabuse.html (Last accessed May 2, 2012).

when she received an epidural injection which did not provide any pain relief. Tr. 379.  Wilkinson reported to Ms. Colunio that she had pain in her low back which radiated into her left hip and numbness down her left leg to her heel. Id.  Wilkinson also reported that she "helps care for her 1-year-old great-niece with a lot of bending and lifting." Id.   A physical examination was normal except for an antalgic gait, reported pain on forward flexion, limited movement with respect to extension and lateral flexion of the spine, and reported pain on palpation of the spinal processes and paravertebral musculature of the lumbosacral region of the spine; reported pain over the left sacroiliac joint and left gluteal musculature; and a positive Fabere sign[45] on the left but negative on the right. Id.  Ms. Colunio scheduled Wilkinson for "a left L5-S1 facet joint injection," continued Wilkinson's prescription for Norco and continued her aquatherapy. Id.  Ms. Colunio reviewed her findings and recommendations with John W. Lockard, M.D., who approved the treatment.  On May 5, 2007, Wilkinson had a "left L5 transforaminal epidural steroid injection under fluoroscopic guidance" performed by Dr. Lockard. Tr. 233.

On June 13, 2007, Wilkinson visited the emergency department at the Robert Packer Hospital in Sayre "complaining of increasing depression" and stating that she felt "she could harm

---

45.  The Faber test or Patrick's test is a pain provocation test which reveals problems  at the hip and sacroiliac regions.  Faber is an acronym which stands for flexion, abduction and external rotation.

herself although she denie[d] any specific plan and any actual
suicidal ideation." Tr. 238.  Wilkinson admitted she had been
drinking and had stopped her psychiatric medications. Id.
Diagnostic tests were ordered, including a blood alcohol level. Tr.
238 and 418. The emergency department physician also noted that
someone from the "Crisis Department [would] speak with her."
However, at some point after the examination by the emergency
department physician, Wilkinson "eloped" from the hospital. Tr.
238.  The blood testing revealed that Wilkinson's blood alcohol
content was .126 percent. Tr. 418.

In August, 2007, Wilkinson commenced receiving care from
Constance Sweet, M.D., of Sweet Family Practice, located in Wysox,
Pennsylvania. Tr. 403-404.  Specifically, on August 27, 2007,
Wilkinson had an appointment at Sweet Family Practice for what
appears to be an annual female health examination. Id.  It is not
clear if Dr. Sweet examined Wilkinson or a certified registered
nurse practitioner. Id.  In any case, a review of Wilkinson's
systems revealed only complaints regarding her "mobius syndrome,"
depression and anxiety. Id.  The results of a physical examination
were essentially normal. Id.  The individual examining Wilkinson
did notice a strong odor of alcoholic beverage on Wilkinson. Tr.
403.  As for Wilkinson's psychiatric condition it was merely noted
that Wilkinson was "crying" and again there was a notation of her
consumption of alcoholic beverage. Tr. 404.  The record of this
appointment gives no indication of Wilkinson's physical functional

abilities, such as gait, muscle strength or range of motion of her extremities or spine.  Wilkinson was prescribed the medications Librium[46] and Lexapro.[47]  Id.  After two weeks had passed, Wilkinson had a follow-up appointment with Dr. Sweet regarding her anxiety. Tr. 402.  Wilkinson reported a 60-70% improvement.  Id.  Dr. Sweet started Wilkinson on the drug Trazodone.  Id.  The record of this appointment gives no indication of Wilkinson's physical functional abilities, such as gait, muscle strength or range of motion of her extremities or spine.

It appears that in mid-September, 2007, Wilkinson was evaluated by Marion Beach, CANAC,[48] at New Horizons, located in Binghamton, New York. Tr. 270-280. Wilkinson was referred to New Horizons by an Alcohol Crisis Center. Tr. 271.  Wilkinson was interviewed by Ms. Beach and during that interview admitted that during the past month had been drinking a pint to a quart of vodka at least 2 to 4 time per week. Tr. 273.  Wilkinson stated that her

---

46.  Librium (chlordiazepoxide) "is used to treat anxiety and acute alcohol withdrawal. It is also used to relieve fear and anxiety before surgery. This medication belongs to a class of drugs called benzodiazepines which act on the brain and nerves (central nervous system) to produce a calming effect." Librium Oral, WebMD, http://www.webmd.com/drugs/drug-5263-librium+oral. aspx?drugid=5263&drugname=librium+oral (Last accessed May 2, 2012).

47.  "Lexapro (escitalopram) is an antidepressant . . . used to treat anxiety in adults and major depressive disorder in adults[.]" Lexapro, Drugs.com, http://www.drugs.com/lexapro.html (Last accessed May 12, 2012).

48.  It is unclear what this abbreviation represents.  Possibly it stands for a certified alcohol and narcotics addiction counselor.

marriage is "strained" because of her drinking. Tr. 277. When asked about her recreational activities, Wilkinson stated that she engages in gardening, reading and family functions.[49] Tr. 275. Wilkinson admitted smoking 1 pack of cigarettes per day. Id.  Ms. Beach conducted a mental status/risk assessment and noted that Wilkinson had no current suicidal ideations or intent; no homicidal ideations or intent; appropriate affect; Wilkinson's mood was "ok"; her social ability "ok"; and there was no evidence that Wilkinson suffered from psychosis. Tr. 278.  Ms. Beach concluded that Wilkinson was not a risk to herself or others but that she should seek mental health services in Pennsylvania. Id.  Ms. Beach's diagnosis was that Wilkinson suffered from alcohol dependence, nicotine dependence, anxiety, depression and panic attacks. Tr. 280.  The document was not signed or dated by Ms. Beach. Id.

On November 5, 2007, Wilkinson had an appointment at the Guthrie Clinic in Athens, Pennsylvania, at which she complained of a sore throat and white spots in the back of her throat. Tr. 240. Wilkinson was diagnosed with oropharyngeal candidiasis (Thrush), a fungal infection. Id.  She was prescribed medications and advised to quit drinking. Id.  The report of this appointment notes Wilkinson's alcohol abuse. Id.  The record of this appointment

---

49.  It is not clear that Wilkinson was indicating that she was presently engaging in those activities. In a document dated March 8, 2008, filed with the Social Security Administration Wilkinson stated as follows: "I used to love to garden - landscape move big rocks, plant shubs (sic) [and] small trees. I loved to carry my toddler nieces around [and] it makes me sad I can't do that anymore." Tr. 149.

gives no indication of Wilkinson's physical functional abilities, such as gait, muscle strength or range of motion of her extremities or spine.

On November 13, 2007, Wilkinson had an appointment with Dr. Sweet regarding "anxiety-alcohol 'getting out of hand.'" Tr. 401.  It was noted that Wilkinson was "very stressed" because of divorce proceedings. Id.  A physical examination was essentially normal. Id.  It was stated that Wilkinson was anxious but that she was in no acute distress and was alert and oriented to person, place and time. Id.  Dr. Sweet's assessment was that Wilkinson suffered from severe anxiety as the result of family stress and that Wilkinson was medicating herself with alcohol. Id.  He stated that Wilkinson was abusing alcohol and prescribed Antabuse. Id. The record of this appointment gives no indication of Wilkinson's physical functional abilities, such as gait, muscle strength or range of motion of her extremities or spine.

The next appointment Wilkinson had with Dr. Sweet was not until April 4, 2008. Tr. 400.  Wilkinson was suffering from bronchitis and was prescribed an antibiotic. Id.  She also complained of depression and anxiety. Id. Dr. Wilkinson prescribed Lexapro. Id.  The record of this appointment gives no indication of Wilkinson's physical functional abilities, such as gait, muscle strength or range of motion of her extremities or spine.

In April, 2008, Dr. Undavia who treated Wilkinson in May and August of 2006 refused to complete a medical source statement

of Wilkinson's mental work-related abilities because he had not followed Wilkinson as a patient and had no current information regarding Wilkinson. Tr. 193-199.

On April 22, 2008, Raphael Kon, M.D., performed a physical consultative examination of Wilkinson on behalf of the Bureau of Disability Determination. Tr. 281-288.  Dr. Kon found that Wilkinson had no limitation of range of motion of her shoulders, elbows, wrists or knees. Tr. 287.  The range of motion of her hips, cervical region of her spine and ankles were also normal. Tr. 288.  With respect to range of motion of the lumbar region, Wilkinson could only bend forward 45 degrees out of a possible 90 degrees and could bend from side to side 10 degrees out of a possible 20 degrees. Id.

Dr. Kon found that Wilkinson although very anxious was alert, awake and oriented and able to follow commands. Tr. 282. A physical examination was essentially normal, except as noted above the limitations in the range of motion of the lumbar region, and some paravertebral tenderness, a positive straight leg raise test on the left, and diminished ankle reflexes. Tr. 283.  Wilkinson had normal grip strength; her sensory, motor and hand examinations were normal; her knees revealed no deformities; her gait and station were intact. Id.  Dr. Kon noted that Wilkinson was not currently on any pain medications. Tr. 284.  Dr. Kon concluded that Wilkinson could sit 6 hours, stand for 1 to 2 hours, and lift and carry 3 pounds because of her spinal surgery. He further indicated that she

37

could never bend, kneel, stoop, crouch, balance and climb and that she had limitations with respect to working at heights, in temperature extremes, and in wet and humid environments. Tr. 285-286.  Dr. Kon's assessment limited Wilkinson to less than the full-range of sedentary work.

On May 14, 2008, Larue Montayne, D.Ed., a psychologist, performed a psychological consultative evaluation of Wilkinson on behalf of the Bureau of Disability Determination. Tr. 289-294. Wilkinson reported that she was upset over her recent divorce and had to move from a beautiful country home to a trailer park. Tr. 290.  She told Dr. Montayne that she began having mental problems about seven years ago when her sister killed her husband. Tr. 291. Wilkinson told Dr. Montayne that she liked to work in the garden, read, write poetry, paint and decorate her home.[50] Tr. 292.  Dr. Montayne indicated that Wilkinson was oriented to person, place and time, but not the date; she recalled his name; she was alert and cooperative; her attention was good; her speech was clear and understandable; the content of her thought was appropriate; she had some difficulty with memory; her demeanor was appropriate; and she was quite aware of her surroundings. Tr. 291. Wilkinson was able to recall five digits forward and three in reverse; her judgment was fair. Tr. 293.  Dr. Montayne diagnosed Wilkinson as suffering from an adjustment disorder with depression and recommended that Wilkinson attend individual therapy. Tr. 293-294.

---

50.  See fn. 49, supra.

On June 10, 2008, Dr. Montayne completed a form on which she indicated that Wilkinson had a slight restriction in the ability to understand, remember and carry out short, simple instructions, and a "marked" restriction in the ability to understand, remember and carry out detailed instructions. Tr. 295. Dr. Montayne indicated that Wilkinson had no restriction with respect to  interacting appropriately with others, but was moderately restricted in the ability to respond appropriately to work pressures and changes in a work setting. Id.

On May 23, 2008, Sharon A. Wander, M.D., reviewed Wilkinson's medical records on behalf of the Bureau of Disability Determination and completed a physical residual functional capacity assessment. Tr. 297-303.  Dr. Wander concluded that Wilkinson's primary diagnosis was low back pain and her secondary diagnosis was a history of scoliosis repair. Tr. 297. The only medical conditions mentioned by Dr. Wander contributing to Wilkinson's low back pain were as follows:

> By history: Back surgery in 1981.
> Seen on 4/8/03 History of scoliosis, [status post] thoracic and thoracolumbar fusion extending down to L3 level from the upper part of the thoracic spine with a rod.  There are no neurologic findings. Referred to pain clinic.
>
> On 4/22/2008 [physical examination] by Dr. R. Kon, M.D. . . .
>
> "History of Scoliosis: [status post] fusion of her Thoracic spine and current K-wire placement[51] of her

51.  Dr. Kon in his report referred to a "K-wire" (Kirschner
(continued...)

entire thoracic and lumbar spine." Still [complains of] pain after spinal surgery.

P/E unremarkable, musculoskeletal unremarkable neurononfoccal. Grip strength 5/5.  Sensory and motor are intact.

She does have a positive straight leg raising on the left.

Her back reveals a large scar from the base of her neck down to her sacral. She does have paravertebral tenderness.

Her lumbar spine reveals approximately 50% reduction with flexion, extension, side bending and rotation of her lumbar spine.

gait and station are intact.

Tr. 302.  There is no indication that Dr. Wander reviewed any of the reports of the radiographs (including the x-rays and CAT scans of Wilkinson's thoracic and lumbar spine). If she had, she would have recognized that Wilkinson's spinal fusion was as the result of the insertion of a Harrington rod.[52]

---

51.  (...continued)
wire) placement. Tr. 282. Dr. Wander repeats this terminology in her report. We assume that Dr. Kon was referring to the Harrington rod. A K-wire is a totally different device from a Harrington Rod. The diameter of the Harrington rod is much greater than the diameter of a K-Wire. Orthopedic Hardware, Musculoskeletal Radiology, Department of Radiology, University of Washington, http://www.rad.washington.edu/academics/academic-sections/msk/teaching-materials/online-musculoskeletal-radiology-book/orthopedic-hardware (Last accessed April 30, 2012); John Park, Orthopedic Hardware and Procedures, http://www.bonepit.com/Lectures/Ortho%20hardware-John%20Park.pdf (Last accessed April 30, 2012); Dorland's Illustrated Medical Dictionary, 944 & 2082 (32nd  Ed. 2012).

52.  The record does not contain evidence of Dr. Wander's qualifications. An internet search for her qualifications suggests that she is a pediatrician and obtained her medical
(continued...)

Dr. Wander found that Wilkinson had the residual functional capacity to perform a limited range of light work. Tr. 297-301. The only limitations were with respect Wilkinson's ability to stoop, crouch and climb ramps, stairs, ladders, ropes and scaffolds. Tr. 299.  According to Dr. Wander, Wilkinson could never climb ladders, ropes or scaffolds but occasionally ramps and stairs. Id.  Also, Wilkinson could only occasionally stoop[53] and crouch. Id.  Dr. Wander found no manipulative, visual or communicative limitations. Tr. 299-300.  However, with respect to environmental limitations, Dr. Wander concluded that Wilkinson should avoid concentrated exposure to extreme cold, humidity, vibration and hazards. Tr. 300.

---

52.  (...continued)
degree from University Cetec, School of Medicine, Santo Domingo, Dominican Republic, which was closed in 1984. Wellness.com, About Sharon Wander, M.D., http://www.wellness.com/dir/2431350/ pediatrician/pa/wilkes-barre/sharon-wander-disability-determinati on-sctn-md (Last accessed April 28, 2012). There is no indication that she has any expertise in neurosurgery or the diagnosis of musculoskeletal disorders and in the limitations imposed by those disorders.

53.  "Some stooping (bending the body downward and forward by bending the spine at the waist) is required to do almost any kind of work[.]" Social Security Ruling 85-15.  "Occasionally" is defined as up to 1/3 of an 8-hour workday or approximately 2.67 hours. Dr. Kon as previously noted concluded apparently based on his examination of Wilkinson and his review of her medical records that Wilkinson could never engage in stooping. That opinion arguably is supported by the fact that Wilkinson had a Harrington rod from the upper thoracic region of the spine down to the L3 level of the lumbar spine, two areas of spondylolisthesis, severe lumbar spinal stenosis and a 50% decrease in her lumbar range of motion.  Dr. Wander, however, contends that Wilkinson can engage in stooping up to 2.67 hours out of an 8 hour day.

On June 7, 2008, Wilkinson was injured when her car hit a tree. She broke the femur bone in her right leg, and had a right lung contusion and a minimal pneumothorax[54] that cleared within a day. Tr. 323-336.  At the time of the accident, Wilkinson was under the influence of alcohol. Tr. 422.  Her blood alcohol level as previously noted was .173 percent. Id.  The fracture of the femur was surgically repaired (open reduction internal fixation (ORIF)) by Paul A. Suarez, M.D., at the Robert Packer Hospital in Sayre. Tr. 344-345.

On June 11, 2008, while recovering from the surgery in the hospital, Wilkinson tried to choke a sitter at her bedside. Tr. 353.  As a result of this incident Wilkinson was evaluated by Jay Shaw, M.D., a psychiatrist. Tr. 353-355.  Dr. Shaw diagnosed Wilkinson as suffering from delirium secondary to her general medical condition and he could not rule out alcohol withdrawal. Tr. 354.  Dr. Shaw gave Wilkinson a GAF score of 20. Id.  Dr. Shaw's recommendation was to "[o]ptimize benzodiazepine to control alcohol withdrawal delirium." Id.  On June 12, 2008, Wilkinson had improved to the point where she could be safely transferred to the Behavioral Science Unit of the hospital. Tr. 360.  On June 20, 2008, Wilkinson was discharged from the hospital with a diagnosis of severe and recurrent major depression, alcohol dependence, status post motor vehicle accident and a GAF score of 50. Tr. 433.

---

54.  Pneumothorax is defined as "an accumulation of air or gas in the pleural space[.]" Dorland's Illustrated Medical Dictionary, 1476 (32nd Ed. 2012).

On June 23, 2008, Wilkinson had a follow-up appointment with Richard Damian, a general surgeon, at the Guthrie Clinic in Sayre. Tr. 381.  Dr. Damian concluded that "[f]rom the standpoint of her injuries I believe she is doing quite well. . . She is ambulating well and following up with orthopedics." Tr. 381. Also, on June 23, 2008, Wilkinson was examined by Dr. Suarez who concluded that Wilkinson was "doing well." Tr. 367. He stated that Wilkinson should "continue with her walker and slowly progress to a cane." Id.  A follow-up appointment with Dr. Suarez was scheduled in one month. Id.

On July 1, 2008, Joseph J. Kowalski, M.D., a psychiatrist, reviewed Wilkinson's medical records on behalf of the Bureau of Disability Determination, including Dr. Montayne's report, and concluded that Wilkinson suffered from depression and alcohol dependence. Tr. 308, 313 and 320.  With respect to whether Wilkinson met the criteria of a Listed impairment (mental), Dr. Kowalski found that Wilkinson had mild limitations with respect to activities of daily living and maintaining social functioning and moderate limitations with respect to maintaining concentration, persistence or pace. Tr. 315.  He further found that she had no repeated episodes of decompensation of an extended duration. Id. With respect to Wilkinson mental residual functional capacity Dr. Kowalski concluded that Wilkinson was able to make simple decisions, carry out short and simple instructions, sustain an ordinary routine without special supervision, and had the mental

capacity to work on a sustained basis. Tr. 320. Dr. Kowalski
completed a mental functional capacity form consistent with those
abilities. Tr. 318-319.

On July 30, 2008, Wilkinson had an appointment with Dr.
Sweet to have a physical examination and medical assistance
paperwork completed. Tr. 399. Wilkinson complained of chronic pain
since the motor vehicle accident. Id.   Previously, she stated that
her problem was in her left leg but now both legs were painful. Id.
Dr. Sweet's examination notes are unrevealing. Id.   There are no
positive (adverse) physical examination findings noted. Id.   Dr.
Sweet's diagnosis was that Wilkinson suffered from depression and
alcohol abuse but was "doing much better overall" and Wilkinson was
instructed to continue the current medications for her depression.
Id.   Dr. Sweet also diagnosed Wilkinson with chronic back and leg
pain and prescribed narcotic pain medications Ultram and Oxycodone
(Oxy 15). Id.

On July 30, 2008, Dr. Sweet also completed a form on
behalf of Wilkinson in which Dr. Sweet stated that Wilkinson was
temporarily disabled for 12 months or more from June 7, 2008 until
August 1, 2009 as a result of the automobile accident. Tr. 322. Dr.
Sweet stated that Wilkinson's diagnosis involved depression, back
pain, and chronic arthropathy (joint disease) caused by trauma. Id.
Dr. Sweet noted that her assessment was based on physical
examinations, clinical history and appropriate tests and diagnostic
procedures. Id.

44

On August 6, 2008, Wilkinson had a follow-up appointment with Dr. Suarez regarding her surgically repaired right femur fracture. Tr. 383.  The assessment was that Wilkinson was doing well and that she could discontinue the use of the walker but she could use a cane if going long distances. Id.  Dr. Suarez did note that she does have some pain in the left leg from another issue which Wilkinson was receiving care from another physician (referring to Dr. Sweet). Id.

On August 19, 2008, Wilkinson after contracting poison ivy had an appointment with Dr. Sweet. Tr. 398. There is no indication in the notes how she encountered the poison ivy. Id. The physical examination findings were essentially normal except for the observation by Dr. Sweet of the rash on Wilkinson's neck, arms and legs. Id.  The record of this appointment gives no indication of Wilkinson's physical functional abilities, such as gait, muscle strength or range of motion of her extremities or spine.

On September 22, 2008, Wilkinson had an appointment with Dr. Sweet regarding her chronic pain. Tr. 397.  Wilkinson told Dr. Sweet that "she has good [and] bad days."  Id.  The comment was made that Wilkinson "was abusing alcohol, but much improved" and "still gets depressed but better." Id.  Also it was stated that "pain in back is getting worse" and Wilkinson "feels stable with depression [and] [n]o thought regarding going back to alcohol." Id. The physical examination results were essentially normal. Id.  It

45

was stated that Wilkinson appeared in no acute distress. Id. Dr. Sweets assessment was that Wilkinson suffered from stable depression, resolved poison ivy and "chronic pain - following with Dr. Suarez October 17, 2008, about femur." Id.  The record of this appointment gives no indication of Wilkinson's physical functional abilities, such as gait, muscle strength or range of motion of her extremities or spine.

On October 16, 2008, Wilkinson had an appointment with Cheryl Perry, a certified registered nurse practitioner, at Sweet Family Practice, regarding a urogynecological condition. Tr. 396. Other than with respect to that condition, the physical examination findings were essentially normal. Id.  It was noted that Wilkinson "look[ed] good and [had] gained [weight] favorably." Id.  The record of this appointment gives no indication of Wilkinson's physical functional abilities, such as gait, muscle strength or range of motion of her extremities or spine.

On October 17, 2008, Wilkinson had a follow-up appointment with Dr. Suarez regarding the fractured right femur. Tr. 384.  A physical examination revealed the following: "Her gait is satisfactory. Her femur is well-healed and nontender with good range of motion of the hip, knee and ankle." Id.  Dr. Suarez reviewed x-rays of the femur and stated as follows: "X-ray shows significant amount of callus formation with excellent radiographic healing and excellent alignment." Id.  Dr. Suarez released Wilkinson to "her activities as tolerated" with reference to her

46

femur. Id.  Dr. Suarez referred to "radicular symptoms"[55] and noted that if that worsens "it would be reasonable to contact Neurosurgery for reevaluation." Id.

On November 18, 2008, Wilkinson had an appointment with Ms. Perry at Sweet Family Practice regarding dizziness when bending over. Tr. 395.  On February 16, 2009, Wilkinson had an appointment with Dr. Sweet for what appears to be her annual female health examination. Tr. 394.  On May 20, 2009, Wilkinson had an appointment with Dr. Sweet regarding anxiety and alcohol abuse. Tr. 392. The records of these appointments give no indication of Wilkinson's physical functional abilities, such as gait, muscle strength or range of motion of her extremities or spine.

On June 16, 2009, Wilkinson had an appointment with Dr. Sweet regarding chronic pain. Tr. 391. The record of this appointment indicates that Wilkinson had decreased range of motion in the back and extremities. Id.  Dr. Sweet's assessment was that Wilkinson suffered from chronic back pain and anxiety. Id.

After the administrative law judge issued her decision in this case counsel for Wilkinson submitted additional medical records to the Appeals Council. We will now review those records but do not rely on them in deciding to remand this case to the Commissioner for further proceedings.

---

55.  This is an obvious reference to Wilkinson's problems with her low back, buttocks and left leg.

47

Three of the records submitted relate to medical treatment Wilkinson had prior to the administrative law judge issuing her decision on December 18, 2009. Specifically, those records relate to treatment on November 2 and 19 and December 10, 2009. Tr. 449-454 and 475-482.

On November 2, 2009, Wilkinson was treated at the emergency department of the Robert Packer Hospital in Sayre for a suicide attempt. Tr. 449-454. Wilkinson cut herself with a razor and was transported to the hospital by ambulance. Id. Her blood alcohol level was .13 percent. Id. The record of this visit gives no indication of Wilkinson's physical functional abilities, such as gait, muscle strength or range of motion of her extremities or spine.

On November 19, 2009, Wilkinson visited Towanda Family Practice and was seen by Barbara Gordon, a nurse practitioner. Tr. 475-477. Wilkinson apparently was "released from [Dr. Sweet's] care" and was seeking prescriptions "for her meds" because she lost them "in a visit to [Robert Packer Hospital]." Id. When nurse Gordon reviewed Wilkinson's systems it appears there were no complaints other than back pain. Id. Also, it appears that Wilkinson told nurse Gordon that she was not suffering from depression, suicidal ideations, hallucinations or memory loss but that she was nervous, anxious and had insomnia. Tr. 476. She also told nurse Gordon that "[t]here is no substance abuse." Id. The results of a physical examination performed by nurse Gordon were

48

essentially normal. Id.  The record of this appointment gives no indication of Wilkinson's physical functional abilities, such as gait, muscle strength or range of motion of her extremities or spine.

On December 10, 2009, Wilkinson had an appointment with Karen Saylor, M.D., at Towanda Internal Medicine. Tr. 478-482. The purpose of the appointment was to establish care so that Wilkinson could obtain pain medications. Tr. 478.  Wilkinson also requested a referral to the pain clinic. Id.  Wilkinson told Dr. Saylor that her "last drink was nearly a month ago." Id.  The results of a physical examination were essentially normal other than as follows: Wilkinson was "anxious-appearing," she had "partial paralysis of facial muscles," and she was "tremulous and tearful." Tr. 480.  Dr. Saylor's assessment was that Wilkinson suffered from anxiety, depression, alcohol dependence and chronic pain, Tr. 481. Dr. Saylor "told [Wilkinson] that chronic opioid therapy [was] not in her best interest [and] likely dangerous given her alcohol and mental health history[.]"  Dr. Saylor declined to prescribed for her opioid drugs. Id.  Wilkinson received prescriptions for the antidepressant Paxil and the anti-anxiety medication Ativan, a benzodiazepine. Id.

Seven of the records submitted to the Appeals Council related to medical treatment received by Wilkinson on or after the date the administrative law judge issued her decision.  Tr. 455-456-472 and 483-496.

On December 18, 2009, Wilkinson was treated for a urinary tract infection by nurse Gordon at Towanda Family Practice. Tr. 483-487. The record of this appointment gives no indication of Wilkinson's physical functional abilities, such as gait, muscle strength or range of motion of her extremities or spine.

On December 23, 2009, Wilkinson was seen by Dawn Lambert, a certified and registered nurse practitioner, at Towanda Internal Medicine regarding a rash. Tr. 488-490.  Wilkinson also wanted "to discuss pain medications that were adjusted by Dr. Saylor on 12/10/09." Tr. 488. The note of this appointment goes on to state as follows:

> Patient presents with boyfriend who verbally expresses his displeasure with the regimen that patient is on. Boyfriend states that patient is in withdrawal at this time, is shaking in bed so badly that he cannot sleep and that patient is driving him nuts. . . Patient and boyfriend were clearly informed by this provider that plaintiff would be seen [and] examined by a nurse practitioner; boyfriend expressed displeasure by saying "we expected to see a real doctor."

Id.  Nurse Lambert reviewed with Wilkinson her systems during which Wilkinson complained of a rash on her arms, legs and chest, informed Ms. Lambert that she vomited one time the previous night, and that she had back pain in the lower lumbar area. Tr. 489. The results of a physical examination were essentially normal other than mildly elevated blood pressure and a rash on the chest and upper and lower extremities. Tr. 489-490  The record of this appointment gives no indication of Wilkinson's physical functional

abilities, such as gait, muscle strength or range of motion of her
extremities or spine.

On December 31, 2009, Wilkinson was treated at the
emergency department of the Robert Packer Hospital and then
admitted to the hospital because of acute psychotic behavior. Tr.
455-456 and 470-471.  Her blood alcohol level was .13 percent. Tr.
463 and 471.  On January 3, 2010, Sheela Prabhu, M.D., requested
that Wilkinson be evaluated by a psychiatrist. Tr. 472. The task
was assigned to Jay Shah, M.D. Id.  Wilkinson refused to be
evaluated by Dr. Shaw. Tr. 472.  Wilkinson apparently stated to Dr.
Shaw as follows: "I do not want to sound rude but me and you had
not clicked in the past and therefore I refuse to be evaluated by
you." Id.  Wilkinson was assigned to another psychiatrist. Id.
However, the name of that psychiatrist or the records of an
evaluation by that psychiatrist were not submitted by Wilkinson's
attorney.  Instead a discharge summary was submitted to the Appeals
Council. Tr. 468-469.  That summary was prepared by Shishira
Bharadwaj, M.D., a specialist in internal medicine. Id.
Wilkinson was discharged to home on January 5, 2010, apparently
with instructions to seek mental health care at Northern Tier
Counseling. Tr. 468.

The final medical record we encounter is a report of an
appointment Wilkinson had with Dr. Saylor on January 21, 2010. Tr.
491-496. That report indicates that Wilkinson's active problems
included depression with anxiety, alcohol dependence, mobius

51

syndrome, chronic back pain, lumbosacral neuritis,[56] lumbar spinal stenosis, spondylolisthesis, and osteoporosis. Tr. 491. The results of a physical examination were essentially normal other than slightly elevated blood pressure. Id.  It was stated that Wilkinson had a normal gait. Tr. 493. The record of this appointment gives no indication of Wilkinson's physical functional abilities.

## DISCUSSION

The administrative law judge at step one of the sequential evaluation process found that Wilkinson had not engaged in substantial gainful work activity since December 7, 2007, the application date. Tr. 14.

At step two of the sequential evaluation process, the administrative law judge found that Wilkinson had the following severe impairments: "disorders of the back, status post fusion; affective disorder; generalized anxiety disorder; personality disorder; alcohol dependence; and status post right femur fracture." Tr. 14. The administrative law judge found that Wilkinson's alleged eye problems[57] and shoulder pain were non-severe impairments. Id.

---

56.  Neuritis is defined as "inflammation of a nerve, with pain and tenderness, anesthesia and paresthesias, paralysis, wasting, and disappearance of the reflexes." Dorland's Illustrated Medical Dictionary, 1263 (32nd Ed. 2012).  Lumbosacral neuritis is the inflammation of nerves in the low back.

57.  At the time of the administrative hearing, it appears that Wilkinson for the first time alleged she had an eye problem.

At step three of the sequential evaluation process the administrative law judge found that Wilkinson's impairments did not individually or in combination meet or equal a listed impairment. Tr. 14-16.

At step four of the sequential evaluation process the administrative law judge found that Wilkinson had no past relevant work but had the residual functional capacity to perform a limited range of light work.[58]   Tr. 16.   Specifically, the administrative

---

58.   The terms sedentary, light, medium, heavy and very work are defined in the regulations of the Social Security Administration as follows:

    (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

    (b) *Light work*.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

    (c) *Medium work*.  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If

(continued...)

law judge found that Wilkinson could perform light work that required lifting[59] 20 pounds occasionally and 10 pounds frequently; standing and/or walking at least three hours in an 8-hour workday; sitting about six hours in an 8-hour workday; an unlimited ability to push and pull objects; occasional climbing of ramps and stairs, and stooping and crouching; and frequent balancing, kneeling, and crawling. Id.  However, the work could not require Wilkinson to climb ladders, ropes or scaffolds; must not involve concentrated exposure to extreme cold, humidity, vibration, and hazards including moving machinery and heights; and must be limited to unskilled work with simple, routine, repetitive tasks in a low stress environment (defined as no more than occasional decision making required and no more than occasional changes in the work

---

58.  (...continued)
     someone can do medium work, we determine that he or she can do sedentary and light work.

     (d) *Heavy work*.  Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

     (e) *Very heavy work*.  Very heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more.  If someone can do very heavy work, we determine that he or she can also do heavy, medium, light and sedentary work.

20 C.F.R. § 416.967.

59.  In her decision the administrative law judge does not specify how much Wilkinson could carry on a frequent or occasional basis.

setting) with only occasional judgment required on the job, and no quota/production rate-based work, but rather goal oriented work. Id.

In setting this residual functional capacity the administrative law judge rejected the opinion of Dr. Sweet and Dr. Kon and relied on the opinion of Dr. Wander.  She also characterized Dr. Anton's interpretation of radiographs as "a relatively normal neurological examination and the doctor is thus recommending a fairly normal course of action for claimant's pain." Tr. 17. Not only did the administrative law judge engage in her lay characterization of Dr. Anton's interpretation of the radiographs as a "normal neurological examination" the administrative law judge characterized Dr. Kon's findings that Wilkinson suffered from chronic pain, lumbar radiculopathy and a 50% reduction in range of motion of the lumbar spine as "a somewhat benign evaluation." Tr. 18.

Based on the above residual functional capacity and the testimony of a vocational expert the administrative law judge at step five of the sequential evaluation process found that Wilkinson could perform unskilled light work as a ticket taker, a video monitor, and a telephone receptionist, and that there were a significant number of such jobs in the regional and national economies. Tr. 21.

The administrative record in this case is 496 pages in length, primarily consisting of medical and vocational records.

Wilkinson makes the following arguments: (1) the administrative law judge failed to give significance to the treating source opinions of Dr. Sweet, consultative examiner Dr. Kon and the treating psychiatrists; and (2) the administrative law judge failed to perform her affirmative obligation to assist Wilkinson in developing the record and exhibited bias against Wilkinson. We have thoroughly reviewed the record in this case and find some merit in Wilkinson's first argument. We need not address Wilkinson's second argument.

This is a very difficult case for several reason. The administrative law judge did not clearly delineate Wilkinson's medically determinable physical impairments.  She refers to severe disorders of the back but does not specify those disorders. Although the administrative law judge mentions scoliosis, a history of fusion surgery with Harrington rod implantation, spondylolisthesis, lumbar stenosis, and left lower extremity radiculopathy in the body of her opinion, we cannot determine from her decision what she found to be (1) the non-severe medically determinable physical impairments and (2) the severe medically determinable impairments. We are also not satisfied that the administrative law judge gave an adequate explanation for rejecting the opinion of Dr. Kon.

The only evidence which arguably supports the administrative law judge's decision is the opinion of Dr. Wander. However, it is not clear that Dr. Wander appropriately considered

the medical evidence as previously noted. Consequently, her opinion
cannot be considered substantial evidence.  Dr. Wander, who merely
did a review of the medical records, assumed that Wilkinson's
scoliosis was corrected with a K-wire.  Furthermore, Dr. Wander did
not address Wilkinson lumbar radiculopathy, osteoporosis,
spondylolisthesis or severe lumbar spinal stenosis.  Basically all
Dr. Wander seems to address is Wilkinson's history of surgery in
1981 to correct the idiopathic scoliosis and it is not clear that
Dr. Wander fully understood how that condition was corrected, i.e.,
erroneously indicating it was corrected with a K-wire.[60]

In this case the administrative law judge erred at step
two of the sequential evaluation process.  The Social Security
regulations contemplate the administrative law judge considering
whether there are any medically determinable impairments and then
when setting a claimant's residual functional capacity considering
the symptoms of both medically determinable severe and non-severe
impairments.  20 C.F.R. § 416.929.  The determination of whether a
claimant has any severe impairments, at step two of the sequential
evaluation process, is a threshold test. 20 C.F.R. § 416.920(c).
If a claimant has no impairment or combination of impairments which
significantly limit the claimant's physical or mental abilities to
perform basic work activities, the claimant is "not disabled" and
the evaluation process ends at step two. Id.   If a claimant has

_____

60.  It is not clear what medical records Dr. Wander reviewed in
light of the fact that she referred to the Harrington rod as a K-
wire.

any severe impairments, the evaluation process continues.  20
C.F.R. § 416.920(d)-(g).  A failure to find a medical condition
severe at step two will not render a decision defective if some
other medical condition was found severe at step two.  However, all
of the medically determinable impairments both severe and non-
severe must be considered at step four when setting the residual
functional capacity.  The social security regulations mandate such
consideration and this court has repeatedly so indicated. See,
e.g., Christenson v. Astrue, Civil No. 10-1192, slip op. at 12
(M.D. Pa. May 18, 2011)(Muir, J.); Little v. Astrue, Civil No. 10-
1626, slip op. at 19-21 (M.D.Pa. September 14, 2011)(Kosik, J.);
Crayton v. Astrue, Civil No. 10-1265, slip op. at 32-35 (M.D.Pa.
September 27, 2011)(Caputo, J.); 20 C.F.R. §§ 416.923 and
416.945(a)(2).

Consequently, a failure at step two to address a medical
condition and make a determination as to whether or not it is a
medically determinable impairment is reversible error.  The failure
of the administrative law judge to specify the medically
determinable impairments, or to give an adequate explanation for
discounting them, makes the administrative law judge's decisions at
steps two and four of the sequential evaluation process defective.

The error at step two of the sequential evaluation
process draws into question the administrative law judge's residual
functional capacity determination and assessment of the credibility
of Wilkinson.  The administrative law judge found that Wilkinson's

medically determinable impairments could reasonably cause Wilkinson's alleged symptoms but that Wilkinson's statements concerning the intensity, persistence and limiting effects of those symptoms were not credible.  This determination by the administrative law judge was based on an incomplete and faulty analysis of all of Wilkinson's medically determinable impairments.

Our review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence.  We will, therefore, pursuant to 42 U.S.C. § 405(g) vacate the decision of the Commissioner and remand the case to the Commissioner for further proceedings.[61]

---

61.  If the administrative law judge at one of the steps of the sequential evaluation process finds that a claimant is disabled and there is medical evidence of drug addition or alcohol abuse, the administrative law judge must determine whether or not the drug addiction or alcoholism is a contributing factor material to the determination of disability. If drug addiction or alcoholism is a contributing factor material the determination of disability, a request for benefits must be denied.

The Social Security regulations set forth the procedure to be followed in making this determination. 20 C.F.R. §§ 404.1535 and 416.935.  In deciding this issue of materiality of drug or alcohol abuse, it is critically important for the administrative law judge to consider all of the psychiatric or physical impairments that remain after excluding the impairments caused by drug and alcohol abuse. The administrative law judge must address in his decision all psychiatric and physical impairments raised by the evidence and decide whether or not each impairment is medically determinable, and if an impairment is medically determinable, whether the condition is severe or non-severe.  Furthermore, if it is not possible to disentangle the limitations attributable to drug addiction or alcoholism from those caused by the other psychiatric or physical impairments, the administrative law judge cannot conclude that substance abuse, whether drug or alcohol abuse, is a contributing factor material to the determination of disability. See Brueggemann v. Barnhart, 348 F.3d 689, 693-696 (8th Cir. 2003).

(continued...)

An appropriate order will be entered.


S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge


Dated: May 4, 2012

_____

61.  (...continued)
     The administrative law judge did not reach the point of
having to determine the issue of the materiality of Wilkinson's
alcohol abuse but the Commissioner in the present appeal still
argues that absent alcohol use Wilkinson can function well enough
to perform unskilled work.  Undoubtedly Wilkinson's alcohol abuse
was a substantial fact with respect to her mental impairments.
However, it is not clear that her alcohol abuse was a substantial
or material factor with respect to her physical impairments. On
remand, the administrative law judge can address this issue if
the need arises.